UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

VIRGINIA B.,

               *Plaintiff*,

    v.

KILOLO KIJAKAZI, Commissioner of
Social Security,[1]

               *Defendant*.

Civil No. 1:20-cv-00493-CMH-MSN

## REPORT AND RECOMMENDATION

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 20, 23). Plaintiff Virginia B. ("plaintiff") seeks judicial review of the final decision of defendant Commissioner of the Social Security Administration, denying her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423 (the "Act"). For the reasons stated below, the undersigned Magistrate Judge recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 20) be DENIED, defendant's Motion for Summary Judgment (Dkt. No. 23) be GRANTED, and the ALJ's decision be AFFIRMED.[2]

## I.    Background

Plaintiff applied for disability insurance benefits on July 27, 2015. Pl. Br. (Dkt. No. 21) at 1. Plaintiff alleged disability beginning August 6, 2013 and claimed the following disabilities: generalized anxiety disorder, posttraumatic stress disorder, panic attacks, irritable bowel

---

[1] Kilolo Kijakazi is the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* section 205(g) of the Social Security Act, 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Dkt. No. 12).  In accordance with those rules, this report and recommendation excludes any personal identifiers such as plaintiff's full name, social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

syndrome, blackouts, and depression. Administrative Record ("AR") at 20.

Plaintiff's application was initially denied on November 17, 2015 (*id.* at 117), and again upon reconsideration on June 15, 2016 (*id.* at 123). A hearing was held on December 13, 2018, before Administrative Law Judge ("ALJ") M. Krasnow. *Id.* at 39-85. Plaintiff, represented by a non-attorney advocate, testified at the hearing, as did a Vocational Expert ("VE"), and plaintiff's husband. *Id.* On January 31, 2019, the ALJ issued a decision finding that plaintiff was not disabled under the Act from July 3, 2015 through the date last insured, September 30, 2017. *Id.* at 31. Plaintiff requested review of the decision by the Appeals Council and the request was denied, finding no basis for review. *Id.* at 1-3.

Having exhausted her administrative remedies, plaintiff filed a Complaint with this Court on April 29, 2020, challenging the ALJ's decision. (Dkt. No. 1). Plaintiff filed a Motion for Summary Judgment (Dkt. No. 20) on November 4, 2020, including a Brief in Support (Dkt. No. 21). The Commissioner filed a Motion for Summary Judgment (Dkt. No. 23) on December 9, 2020, along with a Memorandum in Support (Dkt. No. 24). Accordingly, the parties' motions are ripe for disposition.

## II.      Evidence before the ALJ

Below is a summary of plaintiff's testimony before the ALJ, medical evidence of plaintiff's mental and physical impairments, and state agency opinion evidence.

### A.      Plaintiff's Testimony at the Administrative Hearing

At the hearing on December 13, 2018, plaintiff testified that she was 52 years old and lived with her husband, mother, and sister. AR at 42. Plaintiff testified that she resigned from her job in April 2014 due to "blackouts" and PTSD. *Id.* at 44. Plaintiff's advocate proffered that she suffered from PTSD, anxiety, depression, dissociative identity disorder ("DID"), panic attacks, sleep

disorder, irritable bowel syndrome, acute gastritis, coronary artery disease, and a history of hemorrhagic strokes. *Id.* at 46. Plaintiff testified that she suffered a heart attack and a stroke while in surgery in October 2017 and three strokes after surgery. *Id.* at 50.

Plaintiff testified that she has two master's degrees and was employed as a transcriptionist for the Prince William County Police Department from 2011to 2014. *Id.* at 43-44. Plaintiff stopped work in August of 2013 and took Family Medical Leave and unpaid leave for the duration of her employment. *Id.* at 46. Prior to that, she worked for a law firm doing Social Security work in Alabama. *Id.* at 44. In 2006 and 2007, plaintiff worked as a legal secretary for the juvenile prosecutor in Geary, Alabama. *Id.* at 45. Before that, she worked as a legal secretary for the prosecutor's office in Junction City. *Id.*

Upon examination by her advocate, plaintiff testified that she stopped work when her mental health problems became exacerbated by the stress of her job. *Id.* at 62. She is afraid of people and has night and day terrors. *Id.* These problems subsided, but she stated they returned when her boss failed to take her mental health concerns seriously and repeatedly confronted her about her work performance. *Id.* at 62-63. During this time, she began pulling out her hair and cutting herself. *Id.* at 63. After leaving her job, her mental health problems continued. *Id.* Plaintiff testified that she does not leave her room, has trouble sleeping at night, and only talks to her psychiatrist. *Id.* at 64. She described intrusive thoughts and hiding in a spot in her closet with her doll to feel safe. *Id.* at 65-66. Plaintiff testified that she would be able to respond to requests, suggestions, criticism, corrections, and challenges at work by going to a private place and calming down. *Id.* 68. Plaintiff testified that she rarely travels and does not go anywhere alone. *Id.* at 70. She noted doing things, like going on walks and purchasing clothing, and then not having any memory of it. *Id.*

Since plaintiff stopped working in 2013, she testified that she had been taking online classes in pursuit of two master's degrees. *Id.* at 47. Plaintiff was taking two classes per year. *Id.* at 48. She testified that she had a 4.0 GPA and had completed her first master's program in 2017 or the beginning of 2018, and the second in December of 2018. *Id.* at 48, 49 She testified that she dedicated 10-12 hours per day to her first master's course work. *Id.* For the second master's degree, which was in business, she dedicated 8 hours per day to course work. *Id.* at 49. She testified that her program was a full semester of course work in 9-12 weeks. *Id.* at 51. Plaintiff stated that, following her strokes, she cannot read, write, or hold a pen. *Id.* at 60. However, she can type, and she reads her assigned materials and records class lectures to listen back at a later time. *Id.* at 60.

Plaintiff testified that she no longer drives at the recommendation of her doctor due to blackouts. *Id.* at 43. She noted lingering effects of her strokes, including difficulty forming sentences, numbness in her hands, and falls. *Id.* at 52-54. She noted that she and her husband go on walks around Hobby Lobby or Michaels. *Id.* at 55. After 10 to 25 minutes, she needs to sit or lie down. *Id.* She walks on her treadmill five to ten minutes, three to four times per day. *Id.* at 59. She testified that she cannot lift her granddaughter who weighs 33 pounds. *Id.* at 55. She testified that she does not drink, but that prior to August of 2018, she smoked half a pack to a pack of cigarettes per day. *Id.* at 55-56. She stated that she needs assistance bathing following her strokes, but she is sometimes able to dress herself. *Id.* at 56. She occasionally does laundry. *Id.* at 57. She noted that she has difficulty reading following her surgery and will read the same line repeatedly. *Id*. at 57. She paints, draws, colors, and plays online videogames. *Id.*

The VE testified that plaintiff worked as an administrative clerk, which is categorized as light, semiskilled work. *Id.* at 72. She also worked as a legal assistant, which is categorized as sedentary, skilled work. *Id.* She additionally worked as a paralegal, which is categorized as light,

skilled work. *Id.* Finally, she worked as a court clerk, which is categorized as sedentary, skilled work. *Id.*

The ALJ posed the following hypothetical for the VE to consider: the hypothetical person has plaintiff's same age, education, and past work as described, is limited to light work except to infrequently climb ramps and stairs, occasionally climb ropes, ladders, and scaffolds, is further limited to simple, routine, repetitive tasks, with no production rate or pace of work, and occasional interaction with the general public. *Id.* at 72-73. The VE responded that plaintiff's past work would be eliminated. *Id.* at 73. The ALJ then asked if there would be other jobs in the region or national economy. *Id.* at 64. The VE responded affirmatively that this person could perform the following jobs: inspector and hand packager, label clerk, mail clerk. *Id.* Those are all light, unskilled work. *Id.*

The ALJ then posed the following further limitations: the same hypothetical person as the previous example, except could tolerate occasional changes in the work setting, occasional judgment or decision making, and occasional interaction with co-workers and supervisors. *Id.* at 73. The VE responded that all three jobs from the prior hypothetical would still be available with these additional limitations. *Id.*

The ALJ inquired as to whether there would be work available at the medium level of exertion with the same limitations as hypothetical two. The VE responded affirmatively, the hypothetical person could work as a machine feeder, laundry worker, or transportation cleaner. All medium, unskilled work. *Id.* at 74.

Plaintiff's advocate posed the following hypothetical to the VE: a person with plaintiff's age, education, and employment history, with all the limitations of the person in the ALJ's first hypothetical. He then added the additional limitation that the individual would be unable to attend

work due to mental health symptoms at least three days per month. *Id.* at 75. The VE responded that the individual would not be employable. *Id.* The VE testified that an individual can usually not miss more than one day per month on average. *Id.* at 75-76.

Plaintiff's advocate asked whether, if the same hypothetical person was off task or non-productive at least 20% of the day, employment could be maintained. *Id.* at 76. The VE responded that they would not be able to maintain employment and that an individual can typically not be off task for more than 15% of the workday. *Id.*

Plaintiff's advocate then posed the following hypothetical: the person with the same limitations as the ALJ's first hypothetical, but the individual would occasionally exhibit behavioral extremes and/or be unable to accept criticism or instructions from a supervisor without exhibiting behavioral extremes. *Id.* at 76. The person would be occasionally unable to work in coordination with peers without exhibiting behavioral extremes and would be precluded from operating a motor vehicle. *Id.* The VE responded that the hypothetical person would not be able to maintain competitive employment. *Id.* at 76-77.

Plaintiff's husband next testified before the ALJ. He noted that he works full time, but spends the rest of his time with his wife. *Id.* at 77-78. He testified that his wife experienced "losses of time" that were diagnosed as related to her DID. *Id.* at 78. He testified that she rarely leaves her bedroom, and that she likes to go out to bookstores, but it is difficult to get her to leave the house. *Id.* at 79. He testified that she has short term memory issues and problems staying on task. *Id.* He confirmed that he sometimes finds her in the corner of the closet with a blanket or doll. *Id.* at 79-80. He described going to Hobby Lobby once every six months and a one time walk in a park. *Id.* at 80. Her husband testified that she does not go places alone, as her doctor instructed her not to drive, although plaintiff requested she be permitted to do so. *Id.*

He testified that they spent time researching online programs before she began her master's and selected University of Maryland University College because it had no one-on-one interaction. *Id.* at 81. He stated that she has required extensions to complete assignments due to her disabilities. *Id.* He described each class she takes as six credit-hours which typically requires 10 to 15 hours of work per week, and he stated that plaintiff puts in a total of 14 to 20 hours per week. *Id.* at 81-82. He testified that their friends come over once per week, but that plaintiff does not want to call them herself to invite them over. *Id.* at 83.

### B.   Medical Evidence of Alleged Impairments

Plaintiff alleges an onset date of August 6, 2013. (Dkt. No. 21) at 1. On August 7, 2013, the day after her alleged onset date, plaintiff saw nurse practitioner Stephanie Schutter at Dominion Family Health, reporting increased stress at work and home, abdominal symptoms, and sleeping all the time. AR at 392-93. She presented as distressed and stated her gastrointestinal problems were exacerbated by her stress. *Id.* at 393. She was noted to have a depressed mood, but she denied suicidal plans. *Id.* at 394. The notes indicate normal memory, affect, and judgment. *Id.* at 394. She was visibly shaking and crying during the appointment. *Id.*

On August 12, 2014, plaintiff saw a gastroenterologist as a follow up. *Id.* at 338. She appeared alert, oriented with appropriate mood, affect, and intact memory. *Id.* She reported anxiety, depression, poor sleep, and difficulty concentrating. *Id.* at 339.

In September 2013, plaintiff reported to Dominion Family Health again and said her PTSD was stable, but her medication was not working. *Id.* at 389. Plaintiff believed her stress to be situational. *Id.* Plaintiff stated that she could not return to her job because the stress caused physical symptoms. *Id.* She noted she would request medical leave because she enjoyed working, but did not like her current working environment. *Id.* She reported depression, memory loss, and

confusion. *Id.* at 390. She was noted to be nervous, anxious, and have insomnia. *Id.* A psychiatric

exam that day revealed normal memory, affect, and judgment. *Id.* at 391.

      On October 14, 2013, plaintiff returned to Dominion Family Health and reported that she

left her job, but that she was now stressed by not having a job. *Id.* at 387. It was noted that her

mood, affect, memory, and judgement were normal. *Id.* at 388. She was prescribed Ativan and

Klonopin for anxiety and insomnia. *Id.* at 386-87.

      On January 20, 2014, plaintiff reported to Mary Washington Hospital for an examination

related to a partial outpatient program she was participating in at Snowden. *Id.* at 360-61. She

reported problems with her husband and anger issues from work stress. *Id.* at 360. She noted a

history of cutting herself. *Id.* Her appetite and sleeping were poor. *Id.* She was observed as

depressed and was reported to suffer from depression, migraines, and IBS. *Id.* at 361. She denied

psychiatric hospitalizations or recent counseling, although she had counseling in the past. *Id.* at

360. Her general, abdominal, and neurological exams were normal. *Id.* at 360-61. She was advised

to continue the partial outpatient program and treatment. *Id.*

      On February 18, 2014, following her partial treatment program, plaintiff began to receive

medication management from Dr. Ronald Gaertner. *Id.* at 381. Plaintiff reported anxiety, sleep

disturbance, obsessive rumination, decreased concentration, mood irritability, and possible

appetite disturbance. *Id.* The doctor reported that she was guarded and fearful. *Id.* He reported her

to be fully oriented, with appropriate and goal-directed speech, normal motor activity, normal

stream of thought and thought content. *Id.* Cognitive-intellectual testing revealed intact general

knowledge, memory, and adequate concentration insight, reasoning, and judgment. *Id.* The doctor

diagnosed her with a mood disorder and PTSD. *Id.*

      On March 7, 2014, plaintiff saw Dr. Gaertner for medication management. *Id.* at 380. He

noted that she was working and made changes to her medication. *Id.* Plaintiff saw Dr. Gaertner again on March 28, 2014 for both therapy and medication management. *Id.* at 379. The appointment lasted 20 minutes. *Id.* Plaintiff saw the doctor again in April, May, June, July and September of 2014 for medication management and no therapy. *Id.* at 374-78. Notes indicate that plaintiff made progress at each visit throughout this period and the doctor continued to prescribe medication. *Id.* at 373, 371-2.

She returned for medication management in January 2015, noting some progress. *Id.* at 373. In April 2015, she received medication management and individual therapy. *Id.* at 372. In June 2015, plaintiff visited Dr. Gaertner again for medication management and individual therapy and progress was noted. *Id.* at 371.

On August 7, 2015, plaintiff saw Stephanie Schutter and complained of increased anxiety and depression. *Id.* at 413-14. She noted relationship anxieties and post-traumatic stress. *Id.* at 413. The doctor's notes reveal normal mood, affect, memory, and judgment. *Id.* at 415.

On October 27, 2015, plaintiff had a consultative evaluation by Dr. Faye Romano through the state agency in relation to her application for disability benefits. *Id.* at 423. Plaintiff stated that she read, colored, worked on crafts, and kept busy during the day. *Id.* at 424. She managed her own self-care. *Id.* Plaintiff reported constant worrying and difficulty relaxing. *Id.* at 426. She reported a history of childhood trauma and feelings of panic on a weekly basis. *Id.* at 424. She reported blacking out once or twice per week, losing time without recall. *Id.* Dr. Romano described plaintiff as tearful and shaky, but appropriate to the situation. *Id.* at 425. Her mood was low or anxious, with no evidence of lability. *Id.* at 425. Plaintiff had difficulty with her short-term memory, but no difficulty with recent or long-term memory, had appropriate thought content, intact, and goal-directed thought processes. *Id.* at 425. Dr. Romano described plaintiff as cordial,

easy to work with, able to initiate and sustain social connections, and with adequate judgment for simple social situations. *Id.* at 426.

Dr. Romano diagnosed her as having generalized anxiety, PTSD, unspecified depressive disorder, and an unspecified dissociative disorder. *Id.* While she found plaintiff would not likely be able to complete detailed and complex tasks, she found she would not have difficulty performing simple and repetitive tasks. *Id.* at 427. She found moderate impairments in psycho-emotional functioning, regular attendance, ability to perform work activities consistently, and ability to complete a normal workday. *Id.* She found moderate impairment in interacting with coworkers, the public, and dealing with routine stressors. *Id.* She indicated plaintiff would have a more favorable outcome with weekly counseling and a full psychological evaluation and treatment plan. *Id.*

Plaintiff saw Dr. Gaertner in December 2015 for the first time in six months. *Id.* at 429. She had continued to take her prescribed medication. *Id.* She presented with a blunt affect, depressed mood, anhedonia, and mood lability. *Id.* She denied intrusive thoughts of prior abuse, but maintained significant isolation. *Id.* He noted that her cognitive-intellectual testing, general fund of knowledge, and memory were intact. *Id.* She had adequate concentration, abstraction, insight, reasoning, and judgment. *Id.* Her thought content demonstrated intrusive thoughts of her prior abuse but no illusions or hallucinations. *Id.*

Dr. Gaertner saw plaintiff again February 20, 2016 for individual therapy and medication management. *Id.* at 434. Plaintiff had a depressed and labile mood, low self-esteem and a flat or blunted affect. *Id.* Some progress was noted. *Id.* In April 2016, he again provided therapy and medication management to plaintiff and noted her progress, also finding her "stable." *Id.* at 435.

In April 2016, plaintiff also saw nurse practitioner Stephanie Schutter and complained of

anxiety, panic attacks, and symptoms of PTSD. *Id.* at 595-96. She said she did not leave her house most days. *Id.* at 596. Ms. Schutter noted that her insomnia medication doses were "way higher" than she would prescribe. *Id.* at 596. The notes indicate normal mood, affect, memory, and judgment, and note "Good affect and mood today." *Id.* at 597.

In May 2016, at a visit to Dr. Gaertner for medication management, he noted plaintiff appeared overwhelmed, depressed, anxious, and irritable, but was making some progress. *Id.* at 436. He noted on November 5, 2016, that again she was making progress. *Id.* at 566.

In December 2016, plaintiff reported anxiety and insomnia to her family doctor. *Id.* at 605. The notes indicate a normal mood, affect, memory, and judgment. *Id.* at 607.

In February 2017, plaintiff returned to Dr. Gaertner for individual therapy and medication management. *Id.* at 565. She presented to Dr. Gaertner as tearful. *Id.* In July 2017, he notes that she had made progress. *Id.* at 564.

In July 2017, plaintiff saw her family doctor and reported diarrhea, vertigo, and anxiety. *Id.* All clinical findings were normal and her mood, affect, memory, and judgment were normal. *Id.* at 620.

The record also contains evidence after the date last insured, which the ALJ reviewed, but only considered for the impact through the date last insured, September 30, 2017. *Id.* at 17.[3]

On November 15, 2018, Ms. Schutter wrote a letter describing her treatment of plaintiff over the past 9 years. *Id.* at 670. She found plaintiff could not work in any capacity. *Id.* She noted that plaintiff had PTSD, anxiety with panic attacks, DID, and chronic insomnia. *Id.* She described

---

[3] The record contains evidence that plaintiff was diagnosed with congestive heart failure, chronic obstructive pulmonary disease, left bundle branch block, shortness of breath on exertion, abnormal echocardiogram, dizziness, and giddiness on October 9, 2017. *Id*. at 469. Following that diagnosis, she had an aortic valve replacement and coronary artery bypass grafting. *Id*. at 689. Plaintiff was hospitalized for a stroke on December 28, 2017 and released two days later. *Id.* at 515, 735.

that plaintiff only left the house with a companion and that she is fearful in social situations and afraid to be alone. *Id.* She noted plaintiff's three hemorrhagic strokes and asserted that they impact her short-term memory, and ability to focus and retain information *Id.*

Dr. Gaertner also wrote a letter describing his treatment of the plaintiff on December 5, 2018 for her claim for disability benefits. *Id.* at 754. He stated that plaintiff could not work due to thought disorganization, mood lability, and gross impairment in concentration. *Id.* He indicated a diagnosis of major depression, PTSD, and DID. *Id.* He opined that her loss of concentration, socialization, attention to detail, task completion and anxiety would not subside and would impact her ability to maintain work. *Id.* In a check-box medical source statement on the same day, he indicated poor or no ability to maintain personal appearance, behave in a predictably emotionally stable manner, act predictably in social situations or demonstrate reliability. *Id.* at 756. He described an impairment in activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, and pace. *Id.* at 759-60. Dr. Gaertner left many fields blank writing in "unknown." *Id.* at 755-56. These include ability to make occupational adjustments, make performance adjustments, and impairments in work related activities. *Id.*

C.    **State Opinion Evidence**

On November 17, 2015, Dr. Howard Leizer and Dr. Patricia Staehr, at the initial stage of review, determined that plaintiff suffered from severe anxiety, severe affective disorder, and non-severe inflammatory bowel disease. AR at 93. In reviewing plaintiff's psychological symptoms, Dr. Leizer determined plaintiff had moderate restrictions of activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. *Id.* at 94.[4] He found plaintiff to

---

[4] This assessment uses an older standard of the paragraph B criteria.

be well maintained on medication and interacting normally. *Id.* Dr. Leizer opined that plaintiff could recall short and simple instructions, but would have difficulty with complex or detailed information. *Id.* at 96. He found plaintiff to be not significantly limited in her ability to sustain an ordinary routine without special supervision; work in coordination with others without distraction; or make simple work–related decisions. *Id.* at 96. He predicted she could maintain attention and concentration for two hour periods, and complete an eight hour work day. *Id.* at 96-97. She would experience 1-2 problems per month with attendance, and would need minimal accommodations on an infrequent basis. *Id.* at 97. He found plaintiff to not be significantly limited in asking for assistance, maintaining socially appropriate behavior, and was only moderately limited in ability to interact with the general public, accept instruction, respond appropriately to criticism, and get along with coworkers or peers without distracting them. *Id.* He noted that she should avoid frequent contact with the public, ideally have a well-spaced location with a few coworkers, and would need assistance adapting to change unless the changes were infrequent or implemented gradually. *Id.* Dr. Leizer ultimately found plaintiff not disabled and capable of simple, routine work with limited social interaction. *Id.* at 94, 99.

On June 15, 2016, at the reconsideration level, Dr. Andrew Bockner and Dr. Luc Vinh, found the same impairments as the initial level. *Id.* at 106-07. Dr. Vinh noted no evidence of inflammatory bowel syndrome. *Id.* at 107. Dr. Bockner noted plaintiff had several moderate limitations in activities of daily living, maintaining social function and maintaining concentration, persistence, or pace. *Id.* at 108. Moderate limitations were found in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual. *Id.* at 111. He noted no limitations in remembering locations and work-like procedures or remembering very short and simple

instructions. *Id.* at 110. There was no evidence of limitations in making simple work-related decisions. *Id.* at 111. Dr. Bockner found no significant limitation in completing a normal workday or week without interruption from psychologically based symptoms. *Id.* Socially, he found plaintiff moderately limited in interacting appropriately with the general public, but found no evidence of limitations in asking simple questions, requesting assistance and no significant limitations in responding appropriately to criticism from supervisors or getting along with coworkers. *Id.* She was moderately limited in responding appropriately to changes in the work setting, but would have no trouble with being aware of hazards, taking precautions, and traveling or using public transportation. *Id.* at 112. He concluded plaintiff could perform competitive work with limited access to the general public. *Id.* Dr. Bockner notes that the Consultative Examination of Dr. Romano relied heavily on subjective report of symptoms and was not supported by the totality of the evidence. *Id.* at 113.

## II.   Disability Evaluation Process

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment that makes it impossible to do past relevant work or any other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983). Determining whether an applicant is eligible for disability benefits under the SSA entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity

14

of one of the impairments listed in [the SSA's official Listing of Impairments]; (4) the claimant can perform [her] past relevant work; and (5) the claimant can perform other specified types of work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). Before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC, meaning the most that the claimant can do despite his or her physical or mental limitations. C.F.R. §§ 416.920(h), 416.945(a)(1).

### A.     The ALJ's Decision

On January 31, 2019, the ALJ issued a decision finding plaintiff not disabled through September 30, 2017. AR at 31. As an initial matter, the ALJ noted that claimant had sufficient coverage to remain insured through September 30, 2017, thus, her disability was required to have been established as beginning on or before that date. *Id.* at 13.

Under the first step, the ALJ found that plaintiff did not engage in any SGA from the alleged onset date of August 6, 2013 through the date last insured, September 30, 2017. *Id.* at 16. At step two, the ALJ found that plaintiff had the following severe impairments: coronary artery disease, history of cerebral vascular incidents, affective disorder, anxiety related disorder, posttraumatic stress disorder, and DID. *Id.* The ALJ further found plaintiff's irritable bowel syndrome to be a non-severe impairment. *Id.* at 16-17.

Under step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the SSA's official Listing of Impairments. *Id.* at 17. The ALJ found that there was no treatment or objective studies reflecting plaintiff's coronary artery disease or cerebral vascular accidents before the date last insured and, therefore, those limitations did not meet or equal a listing. *Id.*

In considering her mental impairments, the ALJ looked to whether the impairments created

one extreme or two marked limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. *Id.* at 17. The ALJ found plaintiff to have a mild limitation in understanding, remembering, or applying information. *Id.* This conclusion was based on a review of the consultative exam, plaintiff's limited psychological treatment, and the fact that she obtained two master's degrees after she stopped working. *Id.* at 17-18. The ALJ found a moderate limitation in interacting with others, based on her cooperative and cordial nature during the consultative exam and her psychiatrist's note of moderate findings with regard to social functioning and progress with treatment. *Id.* at 18. Plaintiff lived with her husband, mother, and sister. *Id.* However, she reported significant social isolation and testified that she stayed in her room most of the time. *Id.* The ALJ found moderate limitations as to concentrating, persisting, or maintaining pace. *Id.* The ALJ cited observations from the consultative exam of plaintiff's low-average intellectual abilities and disturbances in executive functioning, but appropriate thought content. *Id.* The ALJ highlighted plaintiff's psychiatrist's reports of intact insight and judgment, intact memory, and cognitive and intellectual testing. *Id.* The ALJ again highlighted that plaintiff was able to complete two master's degrees. *Id.* Last, the ALJ found a moderate limitation in adapting or managing oneself. *Id.* at 19. The ALJ noted her daily activities of reading, coloring, taking baths, working on crafts, and her psychiatrist's lack of notes on this matter. *Id.*

The ALJ further noted that the paragraph C criteria were not satisfied. *Id.* The ALJ highlighted plaintiff's minimal mental health treatment and found that she did not live in a highly structured setting due to her mental impairments. *Id.*

Before proceeding to steps four and five, the ALJ determined plaintiff's RFC. In doing so, the ALJ considered all reported symptoms and the extent to which those were reasonably

consistent with objective medical evidence and opinion evidence. *Id.* at 19-20. The ALJ applied a two-step process, considering first whether the underlying impairment would be reasonably expected to produce plaintiff's symptoms, and second whether the impairments limit plaintiff's functioning. *Id.* at 20. The ALJ determined that, while the impairments could be reasonably expected to cause plaintiff's symptoms, the plaintiff's statements about the intensity and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 21. The ALJ concluded that plaintiff, through the date last insured, had the RFC to perform light work except frequent climbing of ramps and stairs and occasionally climbing ropes, ladders, or scaffolds. *Id.* at 19. The ALJ also limited the plaintiff to jobs involving simple, routine, repetitive tasks with no production rate for pace of work and limited to jobs involving occasional interaction with the general public, coworkers, and supervisors. *Id.*

The ALJ thoroughly summarized the hearing and the evidence of record chronologically. The ALJ described the treatment prior to the date last insured as "conservative and minimal." *Id.* at 26. Plaintiff had limited treatment with her psychiatrist every few months and her primary care provider noted anxiety, but otherwise normal findings. *Id.* Although there is no evidence of coronary disease prior to the date last insured, the ALJ included plaintiff's limitations from her coronary artery disease, valve replacement, and stroke in determining her residual functional capacity. *Id.* at 21-22.

The ALJ gave partial weight to the opinions of the state agency doctors who reviewed plaintiff's physical symptoms. *Id.* at 26. The ALJ gave great weight to the finding that plaintiff's irritable bowel syndrome was nonsevere, but also credited the additional evidence, received at the hearing, of plaintiff's coronary artery disease and strokes that occurred after the date last insured and was not available to the state agency doctors at the time of their review. *Id.* at 27. The ALJ,

17

viewing this in the light most favorable to the plaintiff, credited these conditions as severe impairments and reduced the RFC accordingly. *Id.*

The ALJ gave partial weight to the opinions of the state agency doctors who reviewed plaintiff's psychological symptoms. *Id.* at 27. The ALJ agreed with their finding of primarily moderate limitations, but only afforded partial weight because the doctors used the older paragraph B criteria in their assessment. *Id.* The ALJ otherwise agreed the state agency doctors' opinions were in accord with the record. *Id.* The ALJ again highlighted that she earned two master's degrees during this period and conducted daily activities such as chores, reading, and crafts. *Id.*

The ALJ gave little weight to plaintiff's treating psychiatrist, Dr. Gaertner. *Id.* Dr. Gaertner completed a statement for the initial state agency review in August 2018, which indicated plaintiff had a mood disorder and PTSD. *Id.* He described her as cooperative, well kept, with a bright mood, and social avoidance. He noted her memory was intact, that she had intact thought content, with intrusive thoughts. *Id.* He noted internal stimulation. *Id.* While the ALJ noted that Global Assessments of Functioning are no longer used, Dr. Gaertner gave a score of 55, which indicates moderate symptoms and limitations. *Id.* The ALJ contrasted this with Dr. Gaertner's letter in December 2018 indicating that plaintiff could never return to a work setting due to her inability to concentrate and socialize. *Id.* at 28. The ALJ found his opinion statements to be inconsistent with his treatment notes and the objective evidence of record. *Id.*

The ALJ gave significant weight to the consultative examiner, Dr. Romano. *Id.* Dr. Romano indicated that plaintiff could perform simple tasks, but would have difficulty with detailed and complex tasks. *Id.* She noted moderate impairment in maintaining attendance, performing work activities, and coping with stressors. *Id.* The ALJ found this consistent with Dr. Romano's own examination notes and the record as a whole. *Id.*

18

The ALJ gave little weight to the opinion of plaintiff's nurse practitioner, Stephanie Schutter. *Id.* at 29. Ms. Schutter opined that plaintiff could not work due to inability to engage with the public, fear of social situations, and inability to be alone. *Id.* She noted short-term memory loss and poor grip strength and hand weakness. *Id.* The ALJ found that her opinion was inconsistent with her treatment notes during this time which indicated normal findings. *Id.*

Under step four, the ALJ found that plaintiff was not capable of performing her past relevant work as an administrative clerk, legal assistant, paralegal, or court clerk. *Id.*

Under the final step, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. *Id.* at 30. The ALJ summarized the VE's testimony from the hearing and noted that, even with the additional restrictions added to a light RFC, there were jobs plaintiff could perform. *Id.*

**B.    Appeals Council Review**

On February 26, 2020, the Appeals Council denied plaintiff's request for review, finding no basis for review and declaring the ALJ's decision to be the final decision of the Commissioner of Social Security. AR at 1-3.

**III.    Standard of Review**

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see*

*also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589. When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).  If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson*, 402 U.S. at 401.

Although the standard is high, when the ALJ's determination is not supported by substantial evidence on the record or when the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents a remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curium)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016). When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would

have been different." *Morton-Thompson v. Colvin*, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411-12 (2009)).

## IV.    Analysis

Plaintiff makes two claims: that the ALJ failed to properly account for the state agency psychologists' opinions in crafting the RFC determination and that the ALJ should have provided better reasoning for giving less than controlling weight to the opinion of Dr. Gaertner, a treating medical source.

### A.    The ALJ's Weighing of the State Agency Psychologists' Opinions

Plaintiff argues that the ALJ should have incorporated more of the limitations noted by Dr. Leizer, a state agency psychologist, into the RFC determination. (Dkt. No. 21) at 6.

As plaintiff notes, and the ALJ's opinion demonstrates, the state agency's psychologists' opinions relied on "the old mental criteria and are given partial weight for that reason." AR at 27. However, the ALJ notes "[o]therwise, [the doctors'] opinion is consistent with the claimant's minimal and conservative psychological treatment record." *Id.* Plaintiff's argument seems to be, that, given that the ALJ found the opinions consistent, the limitations suggested throughout the reports should have been fully adopted. Plaintiff states "the mental residual functional capacity is missing multiple significant functional limitations opined by one of Social Security's own reviewing experts without any explanation as to why." (Dkt. No. 21) at 8.

#### 1.    Standard of review

It is the ALJ's exclusive duty, as a fact finder, to make an RFC assessment. *Astrue*, 459 Fed. App'x at 230-31; *see also* 20 C.F.R. § 404.1546(c). The Fourth Circuit has held that an ALJ is not required to base an RFC assessment on a specific medical opinion, but instead on the record as a whole, including subjective complaints, objective medical evidence, and medical source

opinion. *See Felton-Miller v. Astrue*, 459 Fed. App'x 226, 230-31 (4th Cir. 2011). Moreover, this circuit has recognized that an ALJ is entitled to rely on the opinion of a reviewing physician or psychologist when it is consistent with the other evidence in the record. *See, e.g., Johnson*, 434 F.3d at 656-57 (finding that substantial evidence "supports the ALJ's reliance on Dr. Starr's opinion" because his opinion was consistent with other doctors' opinions).

This Court, in reviewing, may not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589; *see also King*, 599 F.2d at 599 (providing that it is not the role of the court to try the case de novo when reviewing disability determinations). The "ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies, or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015).

### 2.    Analysis

In this case, the ALJ found plaintiff's RFC to be:

> light work as defined in 20 CFR 404.1567(b) except frequent climbing of ramps and stairs and occasionally climbing ropes, ladders, or scaffolds. The claimant was limited to jobs involving simple, routine, repetitive tasks with no production rate for pace of work. She was limited to jobs involving occasional interaction with the general public, coworkers, and supervisors.

AR at 19. Plaintiff argues on appeal that many of Dr. Leizer's noted limitations were not incorporated into this RFC. Dr. Leizer found plaintiff to be "moderately limited in her ability to perform activities of daily living; engage in social functioning; and in maintaining concentration, persistence, and pace." (Dkt. No. 21) at 8-9 (citing AR at 94) (These three areas of limitation align with the older paragraph B criteria). Dr. Leizer found that plaintiff could maintain attention for two-hour segments and would have punctuality or attendance

problems 1-2 times per month. AR at 97. Dr. Leizer also opined that plaintiff would need "minimal accommodations on an infrequent basis" and "her best performance would be realized in a well-spaced location with few co-workers" *Id.* He further stated "claimant would need assistance in adapting to change, unless infrequent or implemented gradually" *Id.* All of these notes by Dr. Leizer, however, led him to a conclusion that plaintiff could perform simple, routine, repetitive work with limited social interaction. *Id.* at 93.

As a threshold matter, it is within the ALJ's discretion how to weigh the opinions of all medical sources, including the state agency doctors. It is not within this Court's power to re-weigh the evidence. However, in this case, the ALJ *did* adopt the findings of the state agency doctors. Despite using outdated paragraph B criteria, the ALJ looked to the underlying opinions and incorporated them appropriately.

Both state agency doctors found moderate limitations in daily living, social functioning, and concentration, persistence, and pace. *Id.* at 94. The ALJ explicitly limited the RFC to include jobs with no production rate or pace of work, simple routine, repetitive tasks, and limited interaction with others. Plaintiff does not specify how the ALJ could have further accounted for moderate limitations in daily living.

Plaintiff argues that her limitations in concentration to two hour periods and attendance problems one to two times per month were not taken into account. However, rather than limitations, Dr. Leizer framed these notes on concentration as reasons why she *could* work normally. He stated that, in two hour intervals, plaintiff could "complete an eight hour day" and would have "only" 1-2 attendance problems per month. *Id.* at 97. The VE testified at the hearing that the threshold for absenteeism is typically one day per month. *Id.* at 76. Dr. Leizer's opinion is, therefore, that plaintiff could work a full eight hour day

23

and would likely miss so few days that it would not be of concern. Additionally, on reconsideration review, Dr. Bockner did not indicate that he agreed with these limitations. *See id.* at 111. The record, on the whole, indicates moderate limitations in concentration, at most, which are accounted for by the RFC and limitations concerning production and pace.

Similarly, plaintiff argues that the ALJ failed to address the opinion that plaintiff "would need minimal accommodations on an infrequent basis." (Dkt. No. 21) at 10. Plaintiff has not indicated how the ALJ could have further accounted for plaintiff's need for unknown, minimal, infrequent accommodation.

Plaintiff claims the ALJ failed to consider Dr. Leizer's opinion that "her best performance would be realized in a well-spaced location with few co-workers." AR at 97. Dr. Leizer found plaintiff's social interaction limitations moderate at most. *Id.* On reconsideration, Dr. Bockner found plaintiff's social limitations to be even less limited, finding no evidence of limitation in two categories. *Id.* at 111. By limiting the RFC to limited interaction with the public, coworkers, and supervisors, the ALJ considered and included this limitation.

Finally, plaintiff argues that the ALJ ignored Dr. Leizer's opinion that "claimant would need assistance in adapting to change, unless infrequent or implemented gradually" (AR at 97). Because the need for assistance is unknown and qualified, it is unclear what limitation the ALJ could have further provided. Further, in questioning the VE at the hearing, the ALJ posed a hypothetical person with the limitations contained in the RFC, with the addition of only "occasional changes in the work setting," accounting for this concern by Dr. Leizer. In response, the VE indicated the same jobs would be available. *Id.*

at 73. Again, Dr. Bockner on reconsideration did not include this same limitation. AR at 112.

Both at the initial and reconsideration stage, the state agency experts found plaintiff's limitations to be moderate and non-disabling. They found that plaintiff could perform simple, routine work with limited social interaction. *Id.* at 93, 107. Even if the state agency experts' opinion was given greatest weight and fully adopted, the RFC determination would likely remain the same, rendering any potential error harmless. The ALJ crafted a very limited RFC of light work with additional restrictions and properly considered and incorporated the state agency doctors' opinions. Therefore, the undersigned finds that the ALJ appropriately weighed the state agency physicians' opinions and appropriately included most, if not all, of their recommendations.

**B.   The ALJ's Reasoning for Giving Less than Controlling Weight to Dr. Gaertner's Opinion**

Plaintiff argues that the ALJ failed to provide good reasons supported by substantial evidence for giving less than controlling weight to Dr. Gaertner's opinions. (Dkt. No. 21) at 11. Dr. Gaertner is plaintiff's treating psychiatrist who she saw for medication management and occasionally therapy. The ALJ gave "little" weight to Dr. Gaertner's opinion statements for her disability application, finding them to be inconsistent with his own treatment notes and the medical record as a whole. *Id.* at 27-28. Plaintiff asserts that the record does not support this conclusion.

### 1.   Standard

A treating physician can receive controlling weight if it is well-supported by the evidence and not inconsistent with substantial evidence in the case. 20 C.F.R. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858 (4th Cir. 2017). The ALJ must provide "good reasons" supported by evidence as to why the treating physician was not given controlling weight. 20 C.F.R. § 404.1527

(c)(2). If a medical source is not granted controlling weight, it is evaluated and weighed according to the enumerated factors set out in 20 C.F.R. §404.1527(c): (1) examining relationship; (2) treating relationship; (3) supportability; (4) consistency; (5) specialization; and (6) any other factors that tend to support or contradict the opinion. This calculus is left to the ALJ, and this Court may not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589; *see also King*, 599 F.2d at 599 (providing that it is not the role of the court to try the case de novo when reviewing disability determinations).

## 2. Analysis

The ALJ indicated that Dr. Gaertner's opinion was not given controlling weight because the evaluation, statement, and forms he completed for plaintiff's disability claim were inconsistent with the record. AR at 27-28. There are four items of opinion evidence, all created in support of plaintiff's disability application, to which the ALJ gave little weight: 1) a mental status examination dated August 18, 2018 (*id.* at 366-369), 2) a letter dated December 5, 2018 (*id.* at 754), 3) a medical source statement of plaintiff's ability to do work-related activities, dated December 5, 2018 (*id.* at 755-57), and 4) a medical source statement assessing plaintiff's mental status, dated December 7, 2018 (*id.* at 758-60). It should be noted as an initial matter, the ALJ correctly highlighted that Dr. Gaertner only saw plaintiff a few times each year and primarily for only medication management. *Id.* at 28. He provided "individual therapy" a total of five times. *Id.* at 371, 372, 379, 434, 435. One of these appointments for both therapy and medication management lasted a total of 20 minutes (*id.* at 379), another lasted only 30 minutes (*id.* at 372). This does not diminish the fact that Dr. Gaertner was a treating physician, but does limit his knowledge of plaintiff's psychological state.

As an initial matter, even if Dr. Gaertner's statements had been given greater weight, they

contain information that supports the ALJ's conclusion. For instance, the August 18, 2018 mental status evaluation form, which is only partially completed,[5] indicates plaintiff is "cooperative," "well kept," had a "bright mood," was "oriented to time, place, person," had "intact" memory, "intact" thought content and organization. *Id.* at 368. He also found plaintiff's capability to manage her own funds to be "intact." *Id.* Consistent with the record, he also noted "social isolation, social avoidance," "internal stimulation" and "intrusive thoughts." *Id.* The notes do not indicate the severity of any of these symptoms. The ALJ appropriately gave this statement little weight, in part, because it did not contain functional limitations. *Id.* at 27.

The assessment dated August 18, 2018, is itself inconsistent with the other opinion evidence Dr. Gaertner submitted for the disability evaluation. For example, in the assessment dated December 5, 2018 of plaintiff's ability to work, Dr. Gaertner indicated plaintiff could not manage her benefits whereas the evaluation dated August 18 reflects that she could. *Id.* at 757. In the category entitled "personal-social adjustments," he indicated "poor/none" in the categories of "maintaining personal appearance," "behaving in an emotionally stable manner," "relating predictably in social situations," and "demonstrate reliability." *Id.* at 756. This stands in contrast to his August evaluation which states that plaintiff was "well kept." *Id.* at 368. The December assessment was properly given little weight, for this reason, and because it is otherwise almost entirely blank, with Dr. Gaertner writing in "unknown" as to all issues related to "making occupational adjustments," "making performance adjustments," and "other work related issues." *Id.* at 755-56.

Despite his self reported findings that it was "unknown" how plaintiff would perform in a work setting, in his letter dated December 5, 2018, for plaintiff's disability claim, Dr. Gaertner

---

[5] Dr. Gaertner did not fully complete the categories entitled "social history," "daily activities and interests," "mental status," leaving some pages entirely blank. *See id.* at 366-70.

concluded that plaintiff was unable to maintain work due to her "thought flooding, thought disorganization, mood liability [sic] and gross impairment in concentration." *Id.* at 754. He diagnosed her with major depression, PTSD, and DID. *Id.* He stated that her disorders would impact "any ability to maintain in a work setting [sic] or requiring any level of concentration and organization." *Id.* He believed she would never have the ability to return to the work setting, noting a loss of "concentration, socialization, attention to detail, task completion, [and] overwhelming anxiety." *Id.*

Dr. Gaertner's December 7, 2018 medical source statement assessing mental status indicates that he saw plaintiff every 3-6 months. *Id.* at 758. Dr. Gaertner checked off every symptom of depression, reporting "unknown" for three. *Id.* at 758-59. He indicated she had recurrent severe panic attacks at least once a week, recurrent and intrusive recollections of trauma, restriction of daily living, difficulty maintain social functioning, deficiencies in concentration, repeated episodes of deterioration, and inability to attend work. *Id.* at 759-60. He did not indicate how many days per month she would miss work. *Id.* at 760. This report is entirely inconsistent with his own treatment notes, as documented below.

In addition to the internal inconsistency of the statements submitted in the disability application, Dr. Gaertner's own treatment notes are also inconsistent with his extreme findings in his letter. His treatment notes are both illegible and very minimal in their detail. The form he used at each appointment lists numerous symptoms to check off. *See e.g. id.* at 435. He almost never indicated any symptoms except "other," failing to select items such as "socially isolated," "panic attacks," "impaired concentration," or "memory impairment." *Id.* His findings appear to indicate repeated progress. *See e.g. id.* at 373, 374, 375, 376, 377, 378, 379, 380, 434, 435, 436, 564, 566, 567, 568, 569, 570, 571. In typed notes on December 20, 2015, Dr. Gaertner indicated plaintiff

demonstrated "continued and chronic affective blunting, anhedonia, and mood lability." *Id.* at 429. She appeared depressed and demonstrated intrusive thoughts. *Id.* Her intellectual testing was intact, with a general fund of knowledge, memory was intact, she had adequate concentration and abstraction and adequate insight, reasoning, and judgment. *Id.* He indicates no severe illness or limitations in functioning. This is the only example of legible and comprehensive treatment notes after the start of treatment.

The only example plaintiff cites as a treatment note consistent with Dr. Gaertner's 2018 opinions is a letter following his very first meeting with the plaintiff. (Dkt. No. 21) at 13. This initial treatment letter itself is not consistent with Dr. Gaertner's extreme findings in 2018, but rather is consistent with the RFC determination. The doctor diagnosed plaintiff with a mood disorder and PTSD, but indicated nothing regarding the severity of illness. *Id.* at 381. Aside from plaintiff's subjective statements, Dr. Gaertner noted only that plaintiff was "quite guarded, and fearful." *Id.* He found plaintiff to be "alert, oriented to time place person" with appropriate speech, no overt illusion, delusion, or hallucinatory content. *Id.* He found her to have "intact to general fund of knowledge [sic]; memory," "adequate concentration and abstraction," "insight, reasoning, and judgment are adequate." *Id.* This assessment is, of course, limited in its knowledge, as he had only met plaintiff once. However, it depicts an overall positive image and indicates no severe impairment or inability to work normally.

Further, Dr. Gaertner's opinion is not consistent with the other evidence of record. The ALJ relied on plaintiff's testimony, educational history, lack of therapy, and lack of psychiatric hospitalization to demonstrate her stable mental state. *Id.* The ALJ found all of this evidence inconsistent with the harsh conclusions reached by Dr. Gaertner in his opinion statements. Plaintiff also asserts Dr. Gaertner's opinions are consistent with Dr. Romano's assessment. (Dkt. No. 21)

29

at 13-14. While Dr. Romano found plaintiff to have limitations in short term memory and with complex tasks, her overall assessment was that plaintiff had only moderate impairments and would be able to complete simple, repetitive tasks. *Id.* at 427. Dr. Romano's opinion was given significant weight because it reached moderate conclusions, consistent with the evidence of record, unlike Dr. Gaertner's opinions.

Plaintiff cites a letter from Ms. Schutter in support of plaintiff's disability application as consistent with Dr. Gaertner's opinions. The ALJ found that, while Ms. Schutter repeatedly noted plaintiff's complaints of depression and anxiety, she consistently reported normal mental status examinations. *Id.* at 28. The treatment notes never indicate the severity of plaintiff's mental illness or any limitations. *Id.* at 670. This letter was similarly given "little" weight by the ALJ for the same reasons, but plaintiff does not challenge that decision by the ALJ. *Id.* at 29. Ms. Schutter's finding that plaintiff is "unable to work in any capacity" is inconsistent with her own treatment notes and the other evidence. *Id.* at 670. Ms. Schutter treated the plaintiff as her family practitioner for nine years. Her letter indicates limitations based on plaintiff's coronary artery disease and stroke, which were not treated until after the relevant period. *Id.* at 29. While Dr. Gaertner and Ms. Schutter's opinion letters for plaintiff's disability application are in accord with each other, they are both inconsistent with their own objective and contemporaneous notes. It was within the ALJ's power to give them both little weight, and the ALJ properly explained the rationale as to why this was appropriate.

The ALJ's determination to give Dr. Gaertner's letter and statement "little" weight was proper. The ALJ provided full explanation for why the letter and statement were inconsistent with Dr. Gaertner's own notes and the other evidence of record. After determining that his opinion statements were not entitled to controlling weight, the ALJ had the authority to determine what

weight should be given. This Court does not have the authority to re-weigh that credibility determination. Therefore, the undersigned finds the ALJ articulated "good reasons" supported by substantial evidence for giving lesser weight to Dr. Gaertner's opinion, and recommends affirming the ALJ's decision.

## V.       Recommendation

For the reasons set forth above, the undersigned Magistrate Judge recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 20) be DENIED, defendant's Motion for Summary Judgment (Dkt. No. 23) be GRANTED, and the ALJ's decision be AFFIRMED

## VI.      Notice

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to timely file objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

_____ /s/

Michael S. Nachmanoff
United States Magistrate Judge

August 17, 2021
Alexandria, Virginia